McCrillis. who appeared for the bankrupt, and Mr. Crosby, who appeared for Wood & Bishop, creditors of said bankrupt. The bankrupt on his examination, conducted by Mr. Crosby, attorney for creditors, was asked by me to answer the following written question proposed by Mr. Crosby, viz.: Have you ever made more than one deed to Hinkley & Egery, and if yea, what property and when? The bankrupt answered, that he desired to consult with his counsel, Messrs. Varney & McCrillis, who were present, before answering the question. Being of opinion that it was within my duty by law to determine whether, from the nature of the question and the facts sought to be discovered, the aid of counsel was necessary, and to aid me in deciding whether to refuse or admit the bankrupt to consult his counsel, I asked the following question of the bankrupt. viz.: Have you any recollection or knowledge of the subject-matter inquired into? and decided he should answer this last question without consulting his counsel; and the bankrupt answered, that he desired to consult with his counsel upon this question. I thereupon decided, the bankrupt should answer both of above questions without consulting with his counsel. And the said parties requested that the same should be certified to the judge for his opinion.

---

# Case No. 8,503.

## In re LORD.

[5 N. B. R. 318.] [1]

District Court, D. New Jersey. July 25, 1871.

BANKRUPTCY—FRAUDULENT PREFERENCES—POWER OF ATTORNEY TO CONFESS JUDGMENTS.

Where a debtor gave to his creditors several bonds with warrants of attorney to confess judgments, for money lent in good faith, when neither the borrower or lender had reasonable cause to believe that the debtor was insolvent or intended any fraud upon the provisions of the bankrupt act [of 1867 (14 Stat. 517)], *held*, that judgments subsequently entered thereon, within four months of the date of filing petition in bankruptcy. and where both the debtor and the creditors had cause to believe the debtor to be insolvent, and intended a fraud upon the provisions of the act, were fraudulent preferences. The case of In re Wright [Case No. 18,071] considered and overruled.

[In the matter of F. C. Lord, a bankrupt.]

---

[1] [Reprinted by permission.]

P. L. Voorhees and E. T. Green, for assignee and general creditors.

F. Voorhees and J. Wilson, for judgment creditors.

NIXON, District Judge. This matter comes before the court upon a rule taken by the assignee of the bankrupt, upon certain judgment creditors to show cause why the judgments held by them against the property of the bankrupt should not be set aside as fraudulent preferences, and that the money arising from the sale of said property, by the sheriff, should be paid to such general creditors as had proved their claims according to the provisions of the bankrupt act. From the testimony taken in the case these facts seem to exist. A petition for adjudication in bankruptcy was filed against the bankrupt on the eleventh day of January, eighteen hundred and seventy, and such proceedings were had thereon that he was adjudged a bankrupt on the sixteenth day of February following. At the time of filing the petition there were eight judgments outstanding against the alleged bankrupt, entered in the circuit court of the county of Burlington, upon which executions had been issued, and levies made upon the property of the defendant, more particularly stated hereafter. Upon petitions and proofs filed, the court directed an injunction to issue, restraining the plaintiff and the sheriff of Burlington from all proceedings upon the said executions, and ordered the property levied upon to be sold clear of encumbrance, leaving the judgment creditors the right to show before the court, why the proceeds should be applied to the payment of their judgments in the order in which their liens attached.

We learn from the testimony taken in the case, that the bankrupt commenced business as a country merchant in the village of Marlton in the county of Burlington, about the first of March, eighteen hundred and sixty-four; that his capital did not exceed six hundred dollars; that on the fifth of February preceding, and before he purchased his stock of goods or opened his store, he borrowed of his brother, Wm. R. Lord, two thousand dollars, and gave to him, as evidence of his indebtedness, a bond for the payment of said sum in one year after the date, with interest payable half yearly, and at the same time executed to him a warrant of attorney, authorizing him to confess judgment thereon for the debt due upon his failure to pay the same; that on the fourth of March, eighteen hundred and sixty-four, he borrowed of Thomas Evans, Jr., six hundred dollars, and on the twenty-second of the same month, five hundred dollars more; and on the first of October following, one thousand dollars more; for which sums he executed to the said Evans, like bonds with warrants of attorney to confess judgments; that on the first of March, eighteen hundred

and sixty-five, he borrowed of his brother, Wm. R. Lord, eight hundred dollars, securing the same by bond with warrant of attorney to confess judgment; that in the summer of eighteen hundred and sixty-eight, finding himself unable to pay his bills in Philadelphia as they became due, he borrowed of his brother the further sum of one thousand dollars, giving to him his note due in six months for the amount; that when the note became due he was unable to pay the same, and executed to his brother, on the twenty-fifth of January, eighteen hundred and sixty-nine, another bond with warrant of attorney to secure said debt, but, by mistake, dated the same January twenty-fifth, eighteen hundred and sixty-eight; that on the twentieth of December following, when his brother was entering his judgments upon these bonds, the error in the date of this bond was discovered, and in order to correct it, and to have some allowances for payment made, a new bond was executed for the sum due upon this·defective bond, and judgment entered upon the new bond after the surrender of the old one; that the three judgments held by the said Wm. R. Lord, against the said bankrupt, were entered upon the twentieth of December, eighteen hundred and sixty-nine, upon the said three several bonds executed to him at the time and upon the consideration aforesaid; that the three judgments held by the said Thomas Evans, Jr., against the said bankrupt, were entered upon the twenty-first day of December, eighteen hundred and sixty-nine, upon the three several bonds executed to him at the time and upon the considerations aforesaid; and that no question has been raised against the good faith of these transactions, and no doubt suggested, but that the said several sums of money had been loaned according to the allegation of the judgment creditors, and the admission of the bankrupt. The two remaining judgments in favor of Higgins, Vanaman & Bell and P. H. Medara & Co., against the bankrupt, were entered on the eighteenth day of December—two or three days respectively before the judgments of Lord and Evans, and inasmuch that the results of the questions involved in this case very much depend upon the facts and circumstances attending the giving and entry of those judgments, it is necessary to give to these facts and circumstances a most careful consideration.

The evidence shows that previous to the month of December, eighteen hundred and sixty-nine, the bankrupt had difficulty in meeting his bills, notes and checks as they matured; that during the last year especially his paper was allowed to go to protest, but as this is not unusual amongst country traders and dealers of small means, with whom the chief significance of a protest is the fee of the notary, and who are compelled to trust out their goods to their neighbors upon long credit; no particular apprehension seems to have been excited amongst his creditors on account of these failures to pay. His brother William talked of taking an interest in the business with him, but was not willing to do so as long as these unpaid bills were outstanding. He states in his testimony that the bankrupt was at his house about December fifteen, eighteen hundred and sixty-nine, and that he (William) told him that he should see his creditors, and see what arrangements he could make, and try to get an extension for a year; and that Franklin advised him by letter, on the eighteenth, that he had written to all his creditors for such extension. Thomas Evans, Jr., also admits that the bankrupt talked with him about the partnership with his brother, and of the necessity which existed to have a year's extension for the payment of his debts. Franklin, himself, testifies that on the Wednesday before the seventeenth of December, he addressed a letter to each of his creditors, informing them of his proposed partnership with his brother and asking them to allow to him an extension of one year for the payment of the debts which he then owed to them. Two of these letters have been made exhibits in the case, and are as follows:

"Marlton, Dec. 16, 1869. Dear Sir: I am compelled to ask a favor from all my creditors, and that is, will you sign off with all the rest? If you will, all right; if not, I shall be compelled to stop business. I have a brother that will come in partnership with me, if you will all sign off for that length of time. He has money, and all the goods we buy will pay cash for them. ·Please let me hear from you soon and I will come and see you. Yours truly, F. C. Lord."

The effect upon the creditors of such a letter might have been anticipated. It was an acknowledgment of legal insolvency. It was a confession, of what most of them knew before, that he was not able to pay his debts in the usual course of business as they became due. A race of diligence commenced and they crowded in upon the debtor in hot haste, to get security for their claims. Let us hear the bankrupt's graphic account of what took place. He says, "I wrote to all my creditors that my brother and myself expected to go into partnership on the first day of January, eighteen hundred and seventy. That was on the Wednesday before the seventeenth of December. I asked them for an extension of one year, until I could get time to collect my bills up and settle with them. Charles Jones, one of the firm ·of P. H. Medara & Co., was the first man who came to see me; he came just before night, on December seventeenth; he asked me the state of my affairs, and if my brother was endorsing for me, or would endorse for me; I told him I did not know; had not asked him. He said he was willing to give me the year if I would give him a judgment bond; I refused; told him I did not want to give any bonds; would see my brother and see

what he thought of it. Jones told me it would do no hurt, no one would know how we settled, and I should tell no one how we settled, and that he would hold them for one year and longer if I wanted. When I consented, I gave him the judgment bond or signed it; I told him if he would give me a receipt not to use it for one year unless other creditors pushed me, I would make it. If others pushed me, I was to notify him, and he was to have the privilege to go on with his bond; and he gave me such a receipt; said he had received my letter asking for an extension written on the Wednesday before, and that had brought him there; he said he did not want me to stop business, and hoped I would get through all right. About fifteen minutes after he left, Vanaman & Bell, of the firm of Higgins, Vanaman & Bell, came to me and talked over the matter; I told them I gave Jones, of Medara & Co., a statement and what it amounted to. They told me they would be willing to settle with me the same as the others had done; I told them if they would give me a receipt of the same time. I would. They drew up the bond and I signed it, and they gave me the receipt; they stayed and took supper and went home. Vanaman and Bell also said that they had received my letter to them, and that that had brought them there. Q. When did you first hear that these persons had entered judgment against you? A. On the following Monday morning, December twentieth. Q. After you had given these bonds as before stated, did you see any of your other creditors, and what occurred? A. I did see them. The first man came next day and was John Iszard, of the firm of Smith & Iszard. Iszard asked me what I had done; if any of my creditors had been to see me. I told him they had. He asked me what they had done. I told him the way I had settled with the two parties who came before. He said he would be willing to settle in that way for their book account, but the balance on the check I owed them, he thought I ought to pay in cash. I told him I could not do that; I had not the money. The balance on the check was for one hundred and the book account for thirty-eight or thirty-nine dollars. After we talked awhile, he said he would take the judgment bond for the whole amount. He or I drew it up, and he gave me the same kind of receipt as the others gave. Then after I gave him the bond, I promised him, that if nothing happened, I would pay him the balance on the check on the next Wednesday week, and that he should endorse the balance on the bond. He said he would hold the bond and do nothing with it unless other parties did; I saw the salesman of Chandler & Hart, by the name of Paul; came while Iszard was there. After Iszard got through we went back to the desk. I gave him the same statement I gave Jones, as near as I can recollect. He said their firm was willing to do what the others did, and I gave them a bond and took the same kind

of receipt as I gave the others. Several other creditors came there but I did not see them." The bonds thus executed by the bankrupt to his creditors were due at once; were given partly for open book account, and partly for outstanding promissory notes which were not yet due, and the warrant of attorney accompanying them, authorized an immediate entry of judgment upon them. The receipts which the bankrupt demanded and received when he executed the bonds have been made exhibits, and are in the words following: "Received, Marlton, December seventeenth, eighteen hundred and sixty-nine of Mr. F. C. Lord, his judgment bond, * * * being in full for bills to date * * * and guarantee, not to force the bond under one year unless other parties should push F. C. Lord before that time," which receipts, when interpreted by the testimony and the acts of the parties, simply mean that by virtue of these bonds and warrants of attorney, they had obtained a preference over other creditors, which they meant to maintain and hold at all hazards, but that they would give to the debtor one year in which to pay the debt, without forcing a sale of his property, unless, indeed, their priority should be in somewise endangered by some of the less fortunate creditors pushing for the collection of their claims, in which event they should not be expected by further delay, to lose their preferences.

It appears by the testimony of Evans, that on the evening of the seventeenth of December, after the execution of the bonds to Medara & Co., and Higgins, Vanaman & Bell, he went to the bankrupt's store and there received the information that the bonds had been given. He did not approve of the transactions, and told Lord that he had no business to have done it, and he feared that it would lead to trouble and difficulty. Before this, he says he had had no suspicion or anxiety about the business affairs of the bankrupt, but that now he began to feel unsafe in regard to his bonds and the position in which they stood, and resolved at once to send or take them to the clerk's office at Mount Holly, and have them recorded, thinking they were like mortgages and proper instruments to be recorded; that Lord came to his house on the Sunday evening following; that they had another talk over their affairs, and ascertaining that he was going to Mount Holly on the next day, he asked him to take his bonds to the clerk's office and have them put upon record; that Lord agreed to do so and took them home with him for that purpose; that he saw him again on Monday evening, when he returned to his house and said that the clerk had refused to record his bonds; that he had left them with F. Voorhees, Esq., who had sent a message to him that he would have to come to Mount Holly the next day and qualify to them; that being unwell he was not willing to go unless the bankrupt would agree to take him; that Lord made the agreement and did take him on the next

day; went with him to the lawyer's office and even paid the costs for the entry of the judgments against himself, which money, however, he states was afterwards refunded. He admits that before these judgments were entered, he had full knowledge that the two Philadelphia creditors and also Wm. R. Lord had entered judgment upon their bonds. It also appears by the examination of Wm. R. Lord, that he was informed of the giving of these bonds to the Philadelphia creditors by letter, on the eighteenth of December, and by a personal interview with his brother on Sunday morning, December nineteenth; that he remonstrated with Franklin and was angry about it; predicted that he had done something which would break him up and at once resolved that he would have his own bond recorded; that he went to Mount Holly on Monday morning for that purpose, and there learned, at the clerk's office, that judgment had been entered upon two of the bonds which his brother had given to his mercantile creditors; that upon the recommendation of the clerk, his bonds were taken to the office of F. Voorhees, Esq., to be put into judgments; that whilst engaged in that business, Franklin C. Lord came there and ascertained what was going on; that at the suggestion of Mr. Voorhees, he executed to his brother a new bond for the one thousand dollar bond, bearing date January twenty-fifth, eighteen hundred and sixty-eight, and entered the judgment upon the substituted bond, and that these judgments were taken by Wm. R. Lord, as he informs us, because he understood that his brother was giving other bonds to other creditors.

This state of facts presents to the court the question whether, under the provisions of the bankrupt act, these judgments are valid liens upon the property of the bankrupt, or whether they should be set aside as fraudulent preferences and the proceeds of the sale of the estate levied upon be paid to the general creditors? In considering it, we should first look at the intention of the law. It was designed to prevent preferences, by one insolvent or in contemplation of insolvency. In this respect it differs from the act of eighteen hundred and forty-one, which only avoided preferences given in contemplation of bankruptcy. Its object is as far as possible to insure the equal distribution of the property of persons in failing circumstances among all their creditors. But although preferences are odious in the eye of the law, it is not its policy to work injustice, in order to secure equality. All preferences are not illegal. Liens, honestly acquired, are upheld. Judgments, not tainted with fraud, and not confessed by those who are unable to pay their debts in the usual course of their business, to those who have reasonable grounds for believing that the debtor is insolvent, are protected. Let us apply these tests to the two judgments given by the bankrupt, and one to P. H. Medara & Co., and the other to

Higgins, Vanaman & Bell, on the seventeenth of December, eighteen hundred and sixty-nine.

First. Was Franklin C. Lord at that time insolvent? This question must be determined by the evidence in the case, and considering that carefully, is there any real doubt of the fact that insolvency, legal and actual, then existed? The bankrupt was not only unable to pay his debts in the ordinary course of business, as persons carrying on trade usually do, but there was an absolute inability to pay upon a settlement and winding up of his affairs. He exhibited a statement to his creditors on the seventeenth of January, eighteen hundred and seventy, one month after giving these judgments, and then his liabilities were over sixteen thousand dollars, whilst his assets were only about ten thousand dollars, and he testifies that there was no material change in his pecuniary condition between these dates.

Second. If the debtor was then insolvent, the legal result of giving the judgment was to give a preference, the law presuming that every man intends what is the necessary and unavoidable consequence of his acts. But we are not left to presumption here. He writes to all his creditors on the day before he gave the judgments, in which he describes a condition of affairs which defines legal insolvency. No other interpretation can be given to his statements. His indebtedness is large; his debts have already been extended, are again due and pressing; he asks his creditors to allow him a further extension for one year, alleging that he must stop business unless they will agree to it. The letter awakens their apprehensions and they act promptly. Instead of going into the bankrupt court, where all would share equally, they struggle for bonds with warrants of attorney to confess judgments, that each may secure a preference over the other. These bonds, authorizing an immediate entry of judgment, are given, to some, not to others, the bankrupt in each case requiring the creditor to sign a stipulation that he would not force their collection for a year, unless others should attempt to get their honest dues, which agreement or understanding admits of no other construction than this; that the debtor should give security by judgment to some of his creditors for their debts, in consideration of which the creditor would not compel the payment thereof for one year, unless by his delay he should lose his priority.

Third. Had these judgment creditors, when they took their judgments, reasonable cause to believe that the debtor was insolvent and that a fraud upon the provisions of the bankrupt act was intended? His letter advised them of his insolvency, and was sufficient to put them upon inquiry. Their diligence in obtaining the judgments forcibly suggests the doubts and reveals the fears which they entertained respecting the safety of their claims. But aside from this, their own testimony

seems to me to be conclusive upon this point. One of them (Jones) says that the judgment bond which he took was given in lieu of a note that was just falling due and which the bankrupt had notified them he would be unable to pay, and that he had in fact paid them no money on his indebtedness during the past year; that his notes had been renewed several times, and that the debtor assured him that he expected to be able to pay all his debts, if his creditors would give him a year's extension. Had he not a reasonable cause for believing, nay, for knowing that his debtor was insolvent and that he was obtaining a preference in fraud of the bankrupt law, by demanding and taking a judgment bond due at once, and upon which, without delay, he acquired a lien upon the debtor's property? The other (Bell) states in his examination, that he visited the bankrupt. Lord, at Marlton, on the same day on which the firm received his letter, asking for the year's extension for payment of his indebtedness; that he was informed by him that he had already given a judgment bond to P. H. Medara & Co. to secure their claims; that he was satisfied after an inspection of a statement of his affairs rendered by the bankrupt that he was solvent unless he was forced to sacrifice his property, and that although a part of their debt was not due until the month of February following, he demanded security at once, and took a bond with a warrant of attorney to confess judgment thereon for the express purpose of acquiring a lien upon the bankrupt's estate. The inference from this state of facts is irresistible; that he too had reasonable cause to believe that his debtor was insolvent, and that the inspiration of his conduct was an endeavor to get a preference over other creditors in the payment of his debts.

In considering the remaining judgments, three in favor of William R. Lord and three in favor of Thomas Evans, Jr., I shall look at them together as the principles by which their validity is to be tested apply to all of them alike. Without adverting to the legal consequences of substituting a new bond for one previously given on the day of the entry of the judgments in favor of William R. Lord, and stating the matter most strongly for the judgment creditors, I am now to consider the case of six judgments entered by creditors upon bonds with warrants of attorney to confess judgments, given by the debtor when his solvency had not been questioned, and held by the obligees until the debtor became insolvent and then entered up; executions issued thereon and levies made upon the debtor's property after they had reasonable cause to believe that he was insolvent, and that a fraud upon the law was intended. Are such judgments fraudulent preferences?

In considering this branch of the case, I have been embarrassed by the apparently conflicting provisions of the thirty-fifth and thirty-ninth sections of the bankrupt law, and by the still more conflicting opinions of the different district and circuit court judges in their construction of them. It was held by my predecessor, the late Judge Field, in Re Wright [Case No. 18,071], that where the bankrupt, not being insolvent, borrowed money and gave a bond to the creditors with warrant of attorney to confess judgment, and they afterwards took a judgment thereon and made a levy with a knowledge of the debtor's insolvency, such judgment was good and should be paid out of the assets in court, being the proceeds of the sale of the bankrupt's personal estate. In other words, he seemed to interpret the transaction solely in the light of the provisions of the thirty-fifth section, and viewed it in reference to the condition and knowledge of the parties when the bond was executed and the warrant of attorney given, and not when the lien upon the bankrupt's property was acquired by the entry of the judgment and the levy of the execution. But does not this view overlook the provisions of the thirty-ninth section in reference to the recovery of property conveyed or transferred contrary to the act? These sections in this regard are in pari materia, and must be construed together. Admitting that the primary object of the thirty-ninth section is to define acts of bankruptcy in involuntary cases, yet does not it also expressly provide that if the person shall be adjudged a bankrupt, the assignee may recover back the money or other property so paid, conveyed, assigned or transferred contrary to said act, subject only to the condition that the person receiving the same had reasonable cause to believe that a fraud on the act was intended and that the debtor was insolvent? If any effect is to be given to this clause of the thirty-ninth section, must we not hold that where a debtor stands by and suffers his property to be taken on legal process with intent to give a preference, the creditor having reasonable cause to believe that a fraud upon the act was intended and that the debtor is insolvent, the fruits of such judgment must be surrendered by the creditors either upon a suit brought by the assignee or upon summary proceedings, when, as in the present case, the parties have submitted themselves to the judgment of the court, and that the knowledge on the part of the creditor refers rather to the time when the lien was acquired than to the time when the bond, which is a mere evidence of the debt, and the warrant of attorney, were signed? It ought to be observed that, in the above case, Judge Field rested his opinion mainly upon the decision of the supreme court, as rendered in Buckingham v. McLean, 13 How. [54 U. S.] 151, where the question arose under the bankrupt act of eighteen hundred and forty-one, the provisions of which, in this respect, materially differ from the act of eighteen hundred and sixty-seven; and further, that he expressly stated there was

no evidence to show that the creditor, in entering his judgment, had any reasonable cause to believe that a fraud upon the provisions of the bankrupt law was intended.

I am glad to find that the view of the law which I am constrained to take, is sustained by the reasoning of his honor, Judge McKennon, in the conclusion of the opinion delivered by him in the case of Vogle v. Lathrop [Case No. 16,985]. He says: "Another question remains, which, although it is not raised by any direct allegation in the bill, may, perhaps, be regarded as presented with sufficient distinctness in the bill and answer to call upon the court to consider it. It involves the right of the respondent to hold a lien upon the personal property seized under the executions issued on the judgments. By the thirty-ninth section of the bankrupt act, where any person being bankrupt or insolvent, procures or suffers his property to be taken on legal process with intent to give a preference to his creditors, or with intent to defeat or delay the operation of the act, and shall be adjudged a bankrupt, his assignee may recover back the property so taken, if the person receiving it had reasonable cause to believe that a fraud on the act was intended and that the debtor was insolvent. Passive acquiescence in the seizure of his property in execution by an insolvent debtor when he could prevent it by going into voluntary bankruptcy, has been held to be suffering it to be taken with intent to give a preference within the meaning of the section. In re Black [Id. 1,457]; In re Craft [Id. 3,316]; In re Sutherland [Id. 13,638]. But the facts here import more than inactive submission, if they do not amount to positive procurement on the part of the debtors. They confided to the respondent the secret of their embarrassment and insolvency, and thereupon gave him a judgment for the amount of other judgment indebtedness to him for the very purpose of protecting their surety and better securing the collection of the debts by a prompt seizure of their property in execution; while the plan was abandoned by the respondent upon his conceiving doubts of its efficiency, he immediately issued executions upon some of his other judgments and caused them to be levied upon the personal property of the defendants. Is there any room for doubt, then, that the debtors were moved by an intent to prefer the respondent's debt, and that the respondent was prompted by the debtor's information to seek a preference by an exclusive appropriation of their personal property to his judgments? Such is the clear significance of all the circumstances. But as the assignee might recover back the property seized, if it had been sold, the respondent cannot maintain the advantage thus apparently given and the property or its equivalent must go to the assignee."

Apply this reasoning to the facts in the case before us. Here are two creditors, who have, it is admitted, honest claims against their debtor for sums of money advanced to him at various times, to enable him to carry on his business. As evidence of their debt, they hold bonds with warrants of attorney to confess judgment which give them no lien upon the debtor's property but are valuable, as enabling them at any hour to acquire one by judgment and execution. They hold them for years satisfied with their security, and having no suspicion that the debtor is not able to pay his debts. But the time comes when he is not able, and they know it. They know that he fails to pay his debts as they become due, in the ordinary course of business; that he sends notice to all his creditors; that he must have one year's extension or must stop; that he gives bonds with warrants of attorney to confess judgments to several of his other creditors, and that two of these had entered judgments against him, and that he suffers his property to be taken on legal process on executions in favor of these preferred creditors. With a knowledge of these facts imparted to them by the bankrupt, they first seek to record their bonds with the avowed purpose of putting them in a position where they will be paid in full. And when they learn that such is not the legal result of recording them, they procure judgments to be entered, executions to issue and levies to be made upon the whole estate of the debtor. Can we doubt that the creditor had knowledge of the insolvent condition of the debtor, and that their intent was to get a preference in fraud of the provisions of the law? And how can the conduct of the debtor be explained, except upon the hypothesis that he intended a preference when he suffered his property to be taken under the execution issued upon judgments, to the entry of which he was privy—nay, the entry of which, I think it fair to say, he procured.

Under the bankrupt act of 1841, the supreme court in the case of Shawhan v. Wherritt, 7 How. [48 U. S.] 644, held that after an act of bankruptcy had been committed by the debtor, of which the creditor had knowledge, he could not by proceeding in a state court obtain a valid lien and seize the property of the bankrupt to the exclusion of his other creditors. Such a proceeding was considered a fraud upon the law, and void. It was further held, that acts of bankruptcy committed by the debtor were tests of insolvency, showing the inability or the debtor to pay his debts or carry on his trade; that the policy and aim of bankrupt laws were to compel an equal distribution of the assets of the bankrupt among his creditors; and that hence when a merchant or trader, by any of these tests of insolvency, had shown his inability to meet his engagements, one creditor could not, by collusion with him or by a race of diligence obtain a preference to the injury of others. Such conduct was treated as a fraud upon the act, whose aim

was to divide the assets equally and therefore equitably. Adopting these principles as applicable in all respects to the act of 1867, and recognizing the decisions of Judge Blatchford, in Re Black [supra]; of Judge Hall, in Beattie v. Gardner [Case No. 1,195], and of Judge Woodruff, in Smith v. Buchanan [Id. 13,016], as the best expositions of the scope and spirit of its provisions, and considering all the facts of the case before me, I have no doubt that I ought to hold, and I do hold, that all of these judgments must be set aside as fraudulent preferences, and that the proceeds of the sale of the bankrupt's personal estate must go to and be held by the assignee for the payment of the general creditors.